**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| DE LA CRUZ & ASSOCIATES, INC., | |
| Plaintiff, | |
| v. | CIVIL NO.: 21-1052 (RAM) |
| TRANSFORM SR DE PUERTO RICO LLC, et al., | |
| Defendants. | |

**REPORT AND RECOMMENDATION**

## I.    Procedural Background

On February 2, 2021, De La Cruz & Associates, Inc. ("Plaintiff" or "DLCA") filed a complaint against Transform SR de Puerto Rico LLC ("Transform SR") and Transform KM LLC ("Transform KM"), (collectively "Defendants" or "Transform"). ECF No. 1. In the complaint, DLCA alleges that Transform is liable under breach of contract for failing to pay certain invoices under the Amendment to Advertising Agency Agreement. Id. at 4. DLCA also alleges that Transform breached its duty of good faith by intentionally refusing to order the production of any format work in order to avoid paying commissions. Id. at 5.

On February 12, 2021, DLCA filed a "motion for *ex parte* order for the prejudgment attachment of property and for miscellaneous relief." ECF No. 9. On February 16, 2021, Transform submitted a "special appearance requesting automatic extension to answer or otherwise plead and in opposition to motion for *ex parte* order for the prejudgment attachment of property and for miscellaneous relief and its summary denial." ECF No. 11. On February 20, 2021, DLCA filed a "motion requesting an evidentiary hearing for the requested attachment and

supplement" in light of Transform's opposition which "rendered the *ex parte* nature of the sought attachment unnecessary." ECF No. 14, at 2.

Pending before the court are DLCA's motions requesting prejudgment attachment. ECF Nos. 9, 14. A response in opposition was filed by Transform. ECF No. 22. A reply was filed by DLCA on April 5, 2021. ECF No. 23. A surreply was filed by Transform on April 12, 2021. ECF No. 24. A prejudgment attachment hearing was held on May 4, May 5, and May 25, 2021 via video teleconference. ECF Nos. 35, 37, 38. The parties filed post-hearing briefs. ECF Nos. 42, 43. In its motions for prejudgment attachment and post-hearing brief, DLCA has not indicated that it is moving for prejudgment attachment on the amounts claimed in the complaint stemming from Transform's alleged breach of duty of good faith. ECF No. 1, at 4-5. Thus, DLCA's request for prejudgment attachment is limited in scope to its breach of contract claim.

DLCA claims that Transform breached the Amendment to Advertising Agreement when it failed to pay Agency Fees from April 2020 through March 2021 and that it is entitled to the payment of Agency Fees totaling $699,999.96 for said months. ECF No. 42, at 48-49; Ex. 7. DLCA also claims that Transform improperly applied prompt payment discounts on format work invoices dated from September 30, 2019 through January 23, 2020, and thus, it is entitled to $15,531.34 which is the remaining balance on said invoices due to the alleged improper discount. ECF No. 42, at 48-49; Ex. 8 B, at 1-135. Lastly, it is also claimed by DLCA that Transform failed to pay format work invoices dated February 28, 2020 through August 20, 2020 and it is owed payment in the amount of $9,599.31. ECF No. 42, at 48-49; Ex. 8 B, at 136-181.

## II.    Legal Standard for Prejudgment Attachment

DLCA's request for an *ex parte* prejudgment attachment is moot in light of Transform's opposition and the evidentiary hearing that was held on May 4, May 5, and May 25, 2021. ECF

Nos. 35, 37, 38.[1] "Federal Rule of Civil Procedure 64 empowers federal courts to impose any provisional remedy available under the law of the state where the court is located to 'seiz[e] ... property to secure satisfaction of the potential judgment.'" <u>Santos-Rodríguez v. Viera Torres</u>, Civ. No. 11-1602, 2011 WL 13350253, at *2 (D.P.R. Dec. 30, 2011) (quoting Fed. R. Civ. P. 64). "The applicable Puerto Rico law for provisional remedies is found in Rule 56 of the Puerto Rico Code of Civil Procedure." <u>Buscaglia v. Vasarely</u>, Civ. No. 09-2169, 2010 WL 2733703, *3 (D.P.R. July 8, 2010).

DLCA argues that the proper standard for the issuance of prejudgment attachment is found in Rules 56.3 and 56.4 of the Puerto Rico Code of Civil Procedure. ECF No. 42, at 20-23. Rule 56.3, titled "Bonds," provides that "[a] provisional remedy without the payment of a bond could be granted in any one of the following cases:

> (a) if it can be seen in public or private documents, as defined by law and signed before a person authorized to execute the oath that the obligation is legally demandable, or

> (b) when an insolvent litigant who is expressly exempted by law from the payment of taxes and tariffs, and in the Court's discretion the complaint alleges sufficient facts to establish a cause of action whose probability of success is evident or can be proven, and has probable cause to fear, after a hearing for said purpose, that if said provisional remedy is not obtained the judgment that can be obtained will become moot because there would be no property to execute, or

> (c) if the remedy is processed after the judgment.

<u>See</u> 32 L.P.R.A. App. V, R. 56.3; ECF No. 42-5, at 1. Meanwhile, Rule 56.4 provides, in pertinent part, that "[i]f the requirements of Rule 56.3 are met, the Court shall issue, upon motion

---

[1] Therefore, the requirements for *ex parte* attachment in Rule 56.4 of the Puerto Rico Code of Civil Procedure that "[n]o order of attachment or of prohibition to alienate may issue without prior notice and a hearing, except on a showing by the claimant of a previous proprietary interest in the attached goods, extraordinary circumstances, or likelihood of success through clear and convincing documentary evidence that the debt is liquid, due and demandable" are inapplicable to the present case. <u>See</u> 32 L.P.R.A. App. V, R. 56.4.

of the claimant, a lien order or alienation prohibition." <u>See</u> 32 L.P.R.A. App. V, R. 56.4; ECF

No. 42-5, at 2.

DLCA argues that "pursuant to the clear language of Rule 56.4 . . . once compliance with

one of the circumstances under Rule 56.3 has been established . . . the Court has no discretion to

deny an attachment order." ECF No. 42, at 23. DLCA further argues that it has complied with

Rule 56.3(a) because

> the documents attached to the Complaint, the Motion for Attachment (ECF No. 9),
> the Supplement (ECF No. 14) and the Reply (ECF No. 23) to the Defendants'
> opposition to the Motion for Attachment, and the documents admitted into
> evidence, along with the testimony of the witnesses of both DLCA and Transform
> given during the Hearings, leave no doubt as to the fact that the amounts being
> claimed in the Complaint and the pleadings related to the Motion for Attachment
> are legally demandable obligations that Transform has with DLCA . . .

ECF No. 42, at 34. Thus, DLCA contends that because it has satisfied Rule 56.3(a), Rule 56.4

dictates that "the Court shall issue an order of attachment." ECF No. 42, at 34-35.

Transform, on the other hand, argues that DLCA's contention that, under Rule 56.4, the

court must grant an attachment on the basis that Rule 56.3(a) is satisfied, is "based on a

misinterpretation of Rule 56 as well as a misunderstanding of the nature and scope of provisional

remedies developed by the applicable case law." ECF No. 43, at 26. Transform further argues

that "Rule 56.4's allusion to 'the requirements of Rule 56.3' refers to bond requirements in

general; namely, whether a party is exempted from posting bond or beholden to do so by the

court." <u>Id</u>. As such, Transform argues "the enumerated requirements of the first part of Rule 56.3

are only relevant for determining whether the moving party should be exempted from posting

bond." <u>Id</u>.

DLCA's contention that a prejudgment attachment order must issue, under Rule 56.4, if one of the criteria of Rule 56.3 is satisfied, overlooks the abundance of discretionary language in Rule 56.1. According to Rule 56.1,

> on motion of the claimant, the court may issue any provisional order that may be necessary to secure satisfaction of the judgment. The court may grant an attachment, garnishment, prohibition to alienate, claim and delivery of personal property, receivership, an order to do or to desist from doing any specific act, or it may order any other measure it deems appropriate under the circumstances of the case. In every case in which a provisional remedy is sought, the court shall consider the interests of all the parties and adjudicate as substantial justice may require.

32 L.P.R.A. App. V, R. 56.1 (emphasis added). The only mandate in Rule 56.1 is that "the court shall consider the interests of all the parties and adjudicate as substantial justice may require." Id. Thus, there can be no doubt that Rule 56 "is a flexible standard that allows the court 'ample discretion.'" Magee v. Bea Construction Corp., Civ. No. 12-1738, 2016 WL 3647852, at *1 (D.P.R. July 1, 2016) (quoting Vera-Vélez v. Díaz-Sánchez, Civ. No. 06-2127, 2009 WL 2929337, at *2 (D.P.R. Sept. 8, 2009)); Goya Foods, Inc. v. Wallack Management Co., 290 F.3d 63, 71 (1st Cir. 2002) ("flexibility is the hallmark of Rule 56."); Detersol, S.A. de C.V. v. Benso Corp., Civ. No. 11-1341, 2011 WL 4371917, at *3 (D.P.R. Sept. 19, 2011) ("Rule 56 allows the court ample discretion in deciding whether to issue an order for provisional remedies."); Perfumania, Inc. v. Perfulandia, Inc., Civ. No. 02-2733, 2004 WL 1753249, at *2 (D.P.R. July 30, 2004) ("It is within the Court's discretion to determine whether to issue a provisional order to secure satisfaction of a judgment that could be entered.").

DLCA is correct that Rule 56.4 provides that a prejudgment attachment "shall issue" if a moving party satisfies one of the requirements enumerated in Rule 56.3 that exempts it from posting bond. However, DLCA's argument fails to take into account the hurdle that the moving party must first demonstrate its request for prejudgment attachment is warranted under Rule

56.1. A determination that a request for prejudgment attachment is not warranted under Rule 56.1 obviates the need to assess whether the moving party is exempted from posting bond under Rule 56.3. Hence, Rule 56.4 becomes immaterial. The proper standard for evaluating DLCA's request for prejudgment attachment is pursuant to Rule 56.1.

"The purpose of a prejudgment attachment is to allow a plaintiff to secure the judgment that could be entered in due time." Perfumania, Inc., 2004 WL 1753249, at *2 (citing García v. The Commonwealth Ins. Co., 18 P.R. Offic. Trans. 454 (P.R. 1987)). "The validity of such an attachment depends on the validity of the plaintiff's claim against the defendant-attachee." Buscaglia, 2010 WL 2733703, *3. "Thus, to secure such a remedy, a plaintiff must demonstrate its probability of prevailing on the merits." Detersol, 2011 WL 4371917, at *3; see also Buscaglia, 2010 WL 2733703, *3 ("If the court determined that the plaintiff's claim against the defendant has no merit, it follows that there is no right to the defendant's property, and that the attachment was unwarranted."). "Requiring plaintiff to show a likelihood of success reduces the risk that a defendant who is ultimately absolved of liability will be unnecessarily deprived of property during the litigation." Santos-Rodríguez, 2011 WL 13350253, at *5. "In addition, the party [must] show that the provisional remedy is 'reasonable and adequate ... to guarantee the effectiveness of the judgment which in due time may be rendered.'" Detersol, 2011 WL 4371917, at *3 (citing HMG Property v. Parque Industrial Río Canas, Inc., 847 F.2d 908, 914 (1st Cir. 1998)). "The final factor that often weighs in the analysis is the seriousness of the risk that the plaintiff will not be able to execute the judgment." Santos-Rodríguez, 2011 WL 13350253, at *5; Detersol, 2011 WL 4371917, at *3 ("the court must assess [a party's] capacity to pay any judgment entered against it."). The evaluation of the moving party's likelihood of success on the merits and the risk that it will not be able to execute the judgment is not done in a

vacuum; the court must also consider the circumstances of the case and the interests of all the parties and adjudicate as substantial justice may require. See 32 L.P.R.A. App. V, R. 56.1.

### III. Findings of Fact from the Evidence Introduced at the Prejudgment Attachment Hearing.[2]

#### A. DLCA and Transform

DLCA is a corporation that provides advertising and marketing services for its clients. DLCA's services include strategic planning, the production of advertising materials, traditional and digital media purchasing, public relations, promotions, and analytics for digital media. ECF No. 47, at 20. Transform SR and Transform KM (jointly referred to as "Transform"), respectively, are the operators of the Sears and Kmart stores in Puerto Rico and the United States Virgin Islands ("USVI"). [3] ECF No. 48, at 102. Transform Midco is the parent company of Transform SR and Transform KM and its footprint includes all Sears and Kmart stores. [4] ECF No. 50, at 58. There are currently fifty Sears stores and twenty-five Kmart stores nationwide. ECF No. 50, at 57, 59-60.

Transform SR has two Sears stores in Puerto Rico: one in Plazas Las Américas in San Juan and one in Naranjito. ECF No. 50, at 4-5. The Sears brand central location in Plaza Las Américas sells home appliances, washing machines, and home improvement tools. ECF No. 49, at 11. The Sears full-line location in Plaza Las Américas concentrates on cosmetics and soft lines

---

[2] Citations to the record will be making reference to the transcripts of the hearings held on May 4, 5, and 25, 2021. See ECF Nos. 47, 48, 49, 50. Citations will also be made to the exhibits introduced into evidence. ECF Nos. 39, 40.

[3] On October 15, 2018, Sears Holdings Corporation, and other affiliates, including Sears, filed for bankruptcy protection under Chapter 11 of the Bankruptcy Code (the "Sears Bankruptcy") in the United States Bankruptcy Court for the Southern District of New York. ECF No. 1, at 2, ¶ 7; ECF No. 21, at 2, ¶ 7. As part of the Sears Bankruptcy, in February 2019, the Bankruptcy Court approved the sale of substantially all of Sears Holdings Corporation assets to third-party Transform Holdco LLC. ECF No. 1, at 2, ¶ 8; ECF No. 21, at 2, ¶ 8.

[4] No evidence was presented at the hearing regarding the corporate relationship, if any, that exists between Transform SR and Transform KM, and Transform Holdco LLC. The parties also did not present evidence at the hearing regarding the corporate relationship, if any, that exists between Transform Holdco LLC and Transform Midco.

which include clothing, footwear, and jewelry. ECF No. 49, at 11. Besides such stores, Transform SR has two offices in Puerto Rico which are the Sears Parts and Services, and Sears Home Improvement. ECF No. 48, at 143. Transform KM operates one Kmart store in Puerto Rico that is located in Plaza Las Américas. ECF No. 49, at 10; ECF No. 50, at 5. In 2017, there were eighteen Kmart stores in Puerto Rico, and in 2016, there were eleven Sears stores in Puerto Rico. ECF No. 50, at 4, 5. Transform currently has close to four hundred employees in Puerto Rico at the Sears stores, Kmart store, and other offices. ECF No. 50, at 12. The number of Transform employees has been decreasing since April 2017. ECF No. 50, at 13.

### B. The Advertising Agreement

On September 23, 2011, DLCA entered into the Advertising Agency Agreement ("Original Agreement") with Sears Roebuck de Puerto Rico, Inc. ("Sears"). Ex. 1, at 1. The Original Agreement was subsequently amended by DLCA and Sears on September 23, 2013 ("First Amendment") and on November 24, 2017 ("Second Amendment"). Ex. 2; Ex. 3.

On April 12, 2019, Transform assumed the Original Agreement, as amended, and entered into an Amendment to Advertising Agency Agreement (the "Third Amendment" and jointly with the Original Agreement, First Amendment, and the Second Amendment, the "Advertising Agreement") with DLCA. Ex. 4. The term for the Third Amendment was for four years, *i.e.*, until April 12, 2023. Ex. 4, at 2. The Third Amendment provided that DLCA waived its right to collect any amount that may have been owed under the Original Agreement and that Transform owed zero dollars on amounts owing under the Original Agreement. Ex. 4, at 1-2. Transform does not owe DLCA any amounts that may have been owed by Sears or Kmart prior to the Third Amendment. ECF No. 47, at 99.

### 1.    Agency Fee Provisions

The Original Agreement provided that Sears was required to pay a fee ("Agency Fee") to DLCA for agency services. Ex. 1, at 7, ¶ 4.1. In the Original Agreement, Sears and DLCA stipulated an annual Agency Fee in the amount of $1,000,000, payable in advance, in equal monthly installments of $83,333.33. Ex. 1, at 39, E-1. In the Second Amendment, the Agency Fee was reduced to an annual amount totaling $700,000, paid in monthly installments of $58,333.33 on the first business day of each month. Ex. 3, at 2-3, ¶ 5. The Original Agreement provides that "[i]f the Agency Fee is not agreed upon prior to the beginning of the next calendar year, [Transform] shall continue to pay a monthly fee in the amount of 1/12[th] of the prior year's Base Fee . . . until the negotiated Agency Fee is finalized with retroactive adjustment or until this Agreement is terminated, whichever occurs first."[5] Ex. 1, at 8, ¶ 4.7.

Under the Advertising Agreement, DLCA agreed to perform certain agency services for Transform until April 12, 2023. Ex. 3, at 5, A-1; Ex. 4, at 2. However, Mr. Carlos Thompson ("Mr. Thompson"), President of DLCA, testified that DLCA was not obligated under the Advertising Agreement to provide all of the listed services—and never did provide all such services—every month, because the services were provided based on the volume that Transform had, or the needs that Transform would have each month based on seasonality considerations. ECF No. 47, at 34-36. DLCA was never paid less than the Agency Fee amount depending on the amount of work performed. ECF No. 47, at 38. Additionally, invoices for Agency Fees were never accompanied by supporting documentation and did not contain hours or descriptions of work performed. ECF No. 47, at 38; ECF No. 48, at 155-57.

---

[5] DLCA never submitted a new proposal for Agency Fees to Transform in 2019 or 2020. ECF No. 47, at 77; ECF No. 49, at 71.

### 2.    Commissions for Format Work Provisions

In addition to the Agency Fee, DLCA was entitled to earn a 10% commission on the first $2,000,000 incurred each year on all Transform format work. Ex. 5, at 2, ¶ 5. Format work refers to the production and media purchasing services billed to Transform. ECF No. 47, at 26. Pursuant to the Advertising Agreement, Transform was given a 1.25% discount as an incentive to pay DLCA for billed Format Work within ten calendar days from the date that invoices were delivered to Transform, but such discount only applied if Transform made a full payment on said invoices within that ten-day period. Ex. 1, at 11, ¶ 6.5; Ex. 4, at 2, ¶ 6. Format work invoices were accompanied with supporting documentation of the specific work that was performed. ECF No. 48, at 126-27.

### 3.    Termination Provisions

The Advertising Agreement provided that "[e]ither party may terminate the Agreement, with or without cause, by giving the other party at least ninety (90) days' prior written notice." Ex. 1, at 9, ¶ 5.3. The Advertising Agreement also provided that, "[u]pon termination, [Transform] shall be liable to pay only for Agency Services actually rendered prior to the effective date of termination, which shall in no event be greater than the pro rata portion of the Agency Fee as set forth in Exhibit E." Ex. 1, at 10, ¶ 5.6.

### C. Transform Marketing Department

Prior to the Covid-19 pandemic,[6] Transform employed six people in the marketing department who reported to Mr. David Cruz García ("Mr. Cruz"). ECF No. 49, at 21-23. Mr. Cruz is the market leader for Transform operations in Puerto Rico and the United States Virgin Islands and is the highest-ranking manager for Transform in Puerto Rico. ECF No. 49, at

---

[6] The parties stipulated that the first Covid-19 pandemic lockdown in Puerto Rico began on March 15, 2020. ECF No. 48, at 40-42.

8-9. Mr. Cruz reports to Mr. Jesse González ("Mr. González"), who works at the Transform corporate office in Chicago, Illinois.[7] ECF No. 49, at 9. Five of the marketing employees worked on matters for Transform SR while one employee worked on matters for Transform KM. ECF No. 49, at 22. The marketing department was located at the Transform regional offices on the second level of the Kmart store in Montehiedra.[8] ECF No. 49, at 26.

The annual marketing budget for Transform is set by the corporate finance group in Chicago. ECF No. 49, at 26. According to Mr. Cruz, the marketing budget for Transform SR and Transform KM was approximately two million dollars for fiscal years 2019 and 2020.[9] ECF No. 49, at 38; ECF No. 50, at 27. The annual marketing budget covered all of Transform's marketing expenses including the production of advertising materials and the payment of Agency Fees to DLCA.[10] ECF No. 49, at 38-39; ECF No. 50, at 28. Mr. Cruz explained that the annual marketing budget is generally not changed throughout the year and disclosed that the annual marketing budget was larger prior to 2019. ECF No. 49, at 26, 36-37.

Transform advertises its Sears and Kmart stores in Puerto Rico through various mediums including shoppers, ROPs ("run of paper"), billboards, radio, television, and social media through Facebook. ECF No. 49, at 26-27. Transform's main advertising medium is the shopper that was typically issued on a weekly or biweekly basis. ECF No. 49, at 27-28. A shopper for Sears and Kmart could be between four and twenty-four pages in length and includes information regarding specials on merchandise, store schedules, seasonal merchandise, pharmacy

---

[7] The parties have not clarified which entity they are referring to when they reference the "Transform corporate office," and whether such entity is Transform Holdco LLC, Transform Midco, or some other entity.

[8] The Transform regional offices moved to the Sears store in Plaza Las Américas in April 2021 because the Kmart store in the outlets at Montehiedra closed. ECF No. 49, at 10-11.

[9] Transform's fiscal year 2019 began in February 2019 and concluded at the end of January 2020. ECF No. 49, at 38.

[10] Mr. Cruz testified that he learned of the Agency Fee in 2019 when he had a conversation with the marketing department regarding the allocation of the marketing budget. ECF No. 50, at 29.

services, and store credit cards. ECF No. 49, at 29-30. A shopper is created by the Transform

marketing department and the Transform buyers and requires a minimum of two weeks of lead

time to develop and distribute.[11] ECF No. 49, at 30-31. The Transform buyers were responsible

for submitting a proposal to the marketing department about which articles should be included in

the shopper based on an analysis of various factors including available inventory, the season, and

sales trends. ECF No. 49, at 30, 40. The Transform buyers were also responsible for setting the

price of the articles in the shoppers. ECF No. 49, at 40. For each shopper, approximately two to

three thousand copies are distributed to Sears and Kmart stores directly while twenty thousand

copies are distributed via newspapers, primarily El Nuevo Día. ECF No. 49, at 28-29. The

average cost to produce the shoppers is between $70,000 and $110,000 per month. ECF No. 49,

at 39.

      In contrast, an ROP is an advertisement that appears in a newspaper and is typically one

page in length. ECF No. 49, at 27, 30. The process for creating an ROP is similar to the creation

process for a shopper. ECF No. 49, at 30-31. However, an ROP could be produced in just a few

days and cost between $6,000 and $7,000 per ROP. ECF No. 49, at 39. Transform also advertises

on social media and the Transform marketing department is responsible for deciding when and

what articles to promote in advertisements on Facebook. ECF No. 49, at 27, 47-48. The

Transform marketing department is also responsible for developing the focus of advertisements

for billboards, radio, and television but advertising is done less frequently through those

mediums. ECF No. 49, at 33, 46-47. After receiving the pertinent information regarding the

articles and prices from Transform, DLCA was responsible for identifying and producing the art

and photos that appeared in the shoppers and ROPs. ECF No. 49, at 45. DLCA would submit a

---

[11] Buyers are purchasing agents that are responsible for selecting and ordering the merchandise that is sold in
Transform's stores. ECF No. 49, at 24.

final proposal of the advertisement for approval and also worked on the distribution. ECF No. 49, at 45.

On April 15, 2020, Transform's marketing department was furloughed. ECF No. 49, at 24. Five marketing department employees were ultimately terminated but one employee, Ms. Myrta Gómez ("Ms. Gómez"), eventually returned to work for Transform. ECF No. 49, at 24-25. There are currently two buyers that assist Mr. Cruz with the marketing for Transform. ECF No. 49, at 23.

### D. Invoice Procedures

According to Ms. Vanessa Vega ("Ms. Vega"), credit and collections manager at DLCA, prior to the COVID-19 pandemic, invoices were sent via messenger to Transform's regional offices at the Kmart store in Montehiedra. ECF No. 47, at 248; ECF No. 48, at 40. Ms. Malorie Díaz ("Ms. Díaz"), Transform's marketing coordinator, was Ms. Vega's main contact at Transform who issued purchase orders and received invoices. ECF No. 48, at 114, 254-56. Ms. Díaz referred Ms. Vega to Mr. Edward Booth ("Mr. Booth") as an employee at Transform who could also help with payments. ECF No. 47, at 254, 256-57. Ms. Dilia Peña ("Ms. Peña"), finance manager for Transform SR, confirmed that the invoices from DLCA always arrived by messenger and were hand-delivered to the Transform marketing department where they were usually received by Ms. Díaz. ECF No. 48, at 113, 116. If Ms. Díaz was not present, the invoices were received by other persons in the Transform marketing department. ECF No. 48, at 154. Ms. Peña would also occasionally receive the invoices. ECF No. 48, at 154.

After receiving an invoice from DLCA, Ms. Díaz would attach the supporting documents and purchase order, and make a notation of the amount that needed to be paid. ECF No. 48, at 113. Then, the invoices would be passed to Ms. Brenda Casanova ("Ms. Casanova"), Ms. Peña's

administrative assistant. ECF No. 48, at 113. Ms. Casanova would upload the invoices to the system and print and attach them to the receipt and disbursement. Then, the invoices were submitted to Ms. Peña for verification. ECF No. 48, at 113-14. After Ms. Peña verified the invoices, they were sent to the Transform corporate office for payment. ECF No. 48, at 115. The decision whether to pay invoices was made by the "cash team" in the Transform corporate office. ECF No. 48, at 157-58. Neither Ms. Peña nor Mr. Cruz made decisions regarding the payment of the invoices. ECF No. 48, at 159-60.

After the Transform marketing department was furloughed, as of April 15, 2020, there were only five persons working at the Transform regional office in Montehiedra including Mr. Cruz, Ms. Peña, Ms. Eva Sepúlveda, regional human resources manager, Mr. Alex Sostre, market manager for loss prevention, and Mr. Noel Santiago, director of pharmacy area. ECF No. 49, at 48. Although it is unclear whether there were any communications between Transform and DLCA regarding how and to whom invoices should be notified during the pandemic, no DLCA invoices arrived via messenger to the Transform regional office after March 15, 2020. ECF No. 48, at 127. Upon the commencement of the pandemic lockdown, DLCA began sending invoices to Transform through email communications. ECF No. 48, at 20-24. Ms. Vega emailed the Agency Fee invoices that were prepared by DLCA's accounting department for April, May, June, July, August, September, October, November and December 2020 and January and February 2021 to Ms. Díaz and Mr. Booth. ECF No. 47, at 254-56; ECF No. 48, at 22-24; Ex. 7; Ex. 41 B. Ms. Vega also emailed format work invoices to Ms. Díaz and Mr. Booth. ECF No. 48, at 21-22; Ex. 41 B. However, Ms. Díaz was furloughed by Transform on April 15, 2020 and ultimately terminated. ECF No. 49, at 22-25. Mr. Booth worked for Transform until March or

April, 2020. ECF No. 48, at 149-50. Ms. Vega never received any response from Transform regarding payment of invoices for Agency Fees or format work. ECF No. 48, at 21-24.

### E. DLCA's Work for Transform After the Commencement of the COVID-19 Pandemic

In April 2020, Mr. Cruz received a phone call from Mr. González informing him not to do any more marketing work. ECF No. 49, at 54-56. On April 8, 2020, Mr. Cruz sent an email to Transform corporate office employees Ms. Heather Zawilla and Ms. Kathy Vonch, copied to Mr. González, informing them that the Transform marketing team in Puerto Rico was furloughed, that services from DLCA had been stopped, and that any questions should be addressed to him. Ex. B-2, at 1. Mr. Cruz, however, acknowledged that when the April 8, 2020 email was sent, he had not told Mr. Thompson that DLCA should stop working on matters for Transform. ECF No. 50, at 34.

On April 15, 2020, Mr. Dennis Rivera ("Mr. Rivera"), DLCA's account director for Transform, received an email from DLCA's chief profitability and compliance officer, Mr. Jorge Arroyo ("Mr. Arroyo"), requesting the purchase order ("PO") numbers from Transform so that format work could be invoiced. ECF No. 47, at 162; ECF No. 48, at 85. On the same date, Mr. Rivera had a phone conversation with Mr. Cruz where he was informed that DLCA should bill invoices without a PO number because there was no one in the Transform office to assign the PO number. ECF No. 47, at 144-45, 162-63; Ex. 16 B. Mr. Rivera relayed this information to Mr. Arroyo by email. Ex. 16 B.

Sometime after April 15, 2020, Mr. Cruz called Mr. Thompson to let him know that the Transform marketing department personnel were furloughed, that Transform would not be doing any marketing, and that DLCA should stop doing work. ECF No. 47, at 102; ECF No. 49, at 57; ECF No. 50, at 30-31. According to Mr. Cruz, Mr. Thompson stated that he understood, and that

Transform was not the only DLCA client that put marketing on hold. ECF No. 49, at 57.
Mr. Cruz did not inform Mr. Thompson in that conversation that DLCA had breached the
Advertising Agreement, that the Advertising Agreement was terminated, or that Transform
would stop paying Agency Fees. ECF No. 50, at 31. Mr. Cruz received several phone calls on
unspecified dates from Mr. Thompson during the pandemic checking in, but Mr. Cruz told him
that everything was still on hold as the marketing team was furloughed. ECF No. 49, at 60.

Indeed, Transform did not purchase advertisements for shoppers, ROPs, billboards, radio,
print media, or television March 2020 even though Transform continued making sales in Puerto
Rico during the pandemic thanks to, at least in part, the fact that the Kmart pharmacy and
supermarket department remained open during the government lockdowns.[12] ECF No. 47, at 62-
63; ECF No. 49, at 15; ECF No. 50, at 25. Although an advertisement was done for El Nuevo
Día, it was done without charge from the newspaper due to free credits that Transform had
accumulated. ECF No. 47, at 159, 172-73, 179; ECF No. 50, at 25-26; Ex. 14; Ex. 23.

According to Mr. Thompson, Mr. Cruz later requested that DLCA should continue
working on Facebook. ECF No. 47, at 102; ECF No. 50, at 25, 39. DLCA performed work for
Transform from March 15, 2020 until September 15, 2020 as reflected in DLCA's internal
system called Advantage. ECF No. 47, at 139, 202-03. The Advantage program is DLCA's
internal system to record, process, and track specific jobs for clients. ECF No. 47, at 139-42.
Mr. Rivera was responsible for creating jobs in the Advantage program for specific projects.
ECF No. 47, at 140. After Mr. Rivera entered the job into Advantage, the job was sent to the
Traffic Group at DLCA that assigned the job to a member of DLCA's creative team to produce
the artwork and copy for the job. ECF No. 47, at 176-77. The completed artwork and copy would

---

[12] According to Mr. Rivera, advertisements were not published through these mediums after April 2, 2020. ECF No.
47, at 219.

be sent to Mr. Rivera for the client's approval. ECF No. 47, at 177. Then, the advertisement

returned to the Traffic Group so that it could be published. ECF No. 47, at 176-77. According to

Mr. Rivera, whenever DLCA finished a circular, the same was sent to Transform's team in

Chicago that was responsible for uploading the circular into the Sears.com.pr webpage. ECF No.

47, at 215.

      The Advantage program job list for Transform reflects that DLCA completed sixty jobs

from March 15, 2020 to September 15, 2020. Ex. 37. The Advantage job list reflects the entirety

of all the jobs that were completed by DLCA for Transform during that time period. ECF No. 47,

at 141. Mr. Rivera testified at the hearing regarding the type of work that DLCA completed for

Transform during the pandemic. DLCA's work primarily involved producing artwork and copy

for advertising on the Sears Facebook Page and publishing said social media posts. See Ex. 15 B;

Ex. 18 B; Ex. 21 B; Ex. 22 B; Ex. 25 B; Ex. 26 B; Ex. 27 B; Ex. 28 B; Ex. 30 B; Ex. 31 B; ECF

No. 47, at 160-96. The advertisements in the social media posts promoted Sears Auto Center,

back to school sales, and no IVU tax-free days.[13] On occasion, a budget of $75.00 to $100.00

was assigned to specific social media posts for Facebook. ECF No. 47, at 161, 173; Ex. 15 B; Ex.

21 B. The budget assigned to a social media post was paid to Facebook to boost said post so that

it appeared as an advertisement on other Facebook pages in order to reach a wider audience. ECF

No. 47, at 161, 230-34.  However, if a social media post was not allocated a budget, its audience

would be limited to the followers of the Sears Facebook page. ECF No. 47, at 234-35. DLCA

also communicated with Transform regarding client inquiries on the Sears Facebook Page. Ex.

14 B; Ex. 19 B. In addition to social media work, DLCA also worked on a circular for the Sears

---

[13]The IVU ("Impuesto sobre Ventas y Uso") is a "tax on sales and usage" in Puerto Rico. (translation ours)

website, produced interior and exterior signs for Sears Auto Center, and created a banner for the Sears store in Mayagüez. Ex. 11 B; Ex. 18 B; ECF No. 47, at 149-50, 166-67.

During the pandemic, Mr. Rivera continued to monitor Transform's business. On April 28, 2020, Mr. Rivera sent an email to Mr. Cruz regarding updates to the sears.com webpage. Ex. 17. Mr. Cruz testified that Mr. Rivera had "voluntarily" made updates and that he had told Mr. Rivera in a previous conversation to stop working. ECF No. 50, at 35, 37. Yet, Mr. Cruz's characterization of DLCA's work during the pandemic as "voluntary" is highly questionable. On July 1, 2020, Mr. Rivera sent an email to Ms. Gómez asking if Transform had any plans to do additional advertising work and reminding her that Black Friday and Christmas would be here soon. Ms. Gómez responded to the email informing that Transform would only be doing Facebook advertisements. Ms. Gómez also responded, "can we do a calendar for Facebook, tell me how many posts per week and I will have the information get to you, this would fall within the fixed fee that you all have monthly, correct?" to which Mr. Rivera replied "of course." Ex. 24 B, at 3; ECF No. 47, at 181-82.

In September 2020, Mr. Cruz instructed Mr. Thompson to stop working on Facebook. ECF No. 47, at 51-52. On September 18, 2020, Mr. Thompson sent a text message to Mr. Cruz informing that he talked with Mr. Rivera about not doing any further work for Facebook. Ex. J-1; ECF No. 47, at 142. Mr. Rivera continued to stay up to date on Transform's business and Transform's competitors in case DLCA was asked to provide additional services. ECF No. 47, at 143. Mr. Thompson testified that no work was completed by DLCA after September 2020 that generated format work invoices. ECF No. 47, at 107-08. However, DLCA continued to do some public relations work for Transform related to store closings. ECF No. 147, at 107-08.

**F. Audit Letter**

DLCA is audited by external auditors once per year. ECF No. 48, at 86. The fiscal year for DLCA is from January 1 through December 31. ECF No. 48, at 72. Mr. Arroyo acted as the liaison between the DLCA accounting department and DLCA's external auditors, RSM Puerto Rico ("RSM"). ECF No. 48, at 86-87. As a part of the annual audit process, RSM was provided with a breakdown of the accounts receivable for each of DLCA's clients. ECF No. 48, at 93-94. In order to verify the accuracy of DLCA's accounts receivable for Transform, RSM selected a sample of invoices from DLCA's accounts receivable and prepared an audit letter for Transform. ECF No. 48, at 90-92. The audit letter requested that Transform confirm that four invoices selected by the auditors in the amounts of $58,333.00; $58,333.00; $58,333.00; and $2,368.00 remained outstanding as of December 31, 2020. Ex. 34. Mr. Arroyo clarified that he did not have any input in the selection of invoices that were listed in the audit letter. ECF No. 48, at 96-97.

On February 9, 2021, Ms. Vega sent an email to Mr. Cruz explaining that DLCA was in an audit process and requested that Transform sign and return the attached audit letter. Ex. 34; ECF No. 48, at 62-63. On February 11, 2021 at 5:52 AM, Mr. Cruz forwarded Ms. Vega's email regarding the DLCA audit to various people including Ms. Andrea Anderson ("Ms. Anderson") and Ms. Peña. Ex. 34. Subsequently, on February 11, 2021, at 10:09 AM, Ms. Anderson sent an email to Ms. Vega, copied to Mr. Cruz and Ms. Peña, among others, requesting that she "send copies of these invoices" as "[w]e do not have record of them."[14] Ex. 34. On February 11, 2021 at 3:30 PM, Ms. Vega sent an email to Ms. Anderson informing that she can send the invoices and "I've been sending the invoices to Edward Booth, does he still work with Sears Transform?" Ex. 35.

---

[14] Ms. Vega testified that she did not know Ms. Anderson "but from her email address I understand that she is a Transform employee." ECF No. 48, at 26.

On February 11, 2021 at 4:54 PM, Ms. Vega emailed Ms. Anderson and attached the four invoices that were referenced in the audit letter. Various people, including Mr. Cruz and Ms. Peña, were copied to the email. Ex. 36. Ms. Vega also inquired in the email whether Transform needed a statement of accounts. Ex. 36. Ms. Peña saw the invoices attached to the email, but she did not process said invoices because they were not sent to her for payment. ECF No. 48, at 163. Ms. Peña did not ask anyone why DLCA was sending those invoices and she did not respond to Ms. Vega's email. ECF No. 48, at 163, 166-68. Ms. Peña also did not request a statement of accounts. ECF No. 48, at 168.

**G. Termination of the Advertising Agreement**

Between September 2020 and October 2020, Mr. Thompson and Mr. Cruz had at least three conversations where Mr. Cruz mentioned that headquarters wanted a smaller scope of work for next year. ECF No. 47, at 52-53. Mr. Thompson informed Mr. Cruz about the termination provision in the Advertising Agreement and told him that Transform would have to provide a termination letter to terminate the existing relationship between the parties and enter into a new contract with a new scope of work. ECF No. 47, at 52-53. Mr. Thompson offered to write Mr. Cruz a letter explaining the provisions in the Advertising Agreement that could be shared with headquarters. ECF No. 47, at 52-53. Subsequently, Mr. Cruz asked Mr. Thompson to write an email explaining the termination notice and how the billings were made under the Advertising Agreement so that he could forward it to his superiors in Chicago. ECF No. 47, at 53-54; ECF No. 50, at 44-46.

On October 23, 2020, Mr. Thompson sent the requested email to Mr. Cruz regarding the Advertising Agreement. Ex. 38. In the email, Mr. Thompson explained the structure of the Advertising Agreement and wrote "[i]n the past days we have been talking regarding our

contract agreement, fees 2020 and contract renegotiation for 2021." Ex. 38. Mr. Cruz, however,

testified that he had not discussed 2020 Agency Fees with Mr. Thompson prior to receiving his

October 23, 2020 email. ECF No. 50, at 44-45. Inexplicably, Mr. Cruz further testified that he

did not think it was "odd" that Mr. Thompson was referring to "fees 2020" because "it's what he

chose to write here. It's not necessarily what we talked about. So I just forwarded it just as he

sent it." ECF No. 50, at 45-46. Mr. Cruz forwarded the email from Mr. Thompson to the

Transform team in Chicago. ECF No. 50, at 45-46. DLCA never received a response to said

email. ECF No. 47, at 54.

On December 30, 2020, Mr. Thompson sent an email to Mr. Cruz informing that

"Transform owes DLCA $1,150,087.65, which includes $550,087.65 of unpaid fees plus

$600,000 of commissions due and owing under the Advertising Agency Agreement, as amended

last in 2019." Ex. 39. According to Mr. Cruz, this was the first time that anyone from DLCA had

contacted him regarding the amounts detailed in the email. ECF No. 49, at 69. Mr. Cruz did not

receive any further communications from Mr. Thompson regarding these amounts. ECF No. 49,

at 69.

On February 2, 2021, DLCA filed the complaint in this case. ECF No. 1. On March 23,

2021, DLCA received a written termination notice from Transform terminating the Advertising

Agreement. Ex. 6, at 2. The termination notice stated that "Transform has not requested,

required, needed, or received any of the agency services set forth in the Agreement since at least

March 15, 2020." Ex. 6, at 2. The termination notice also stated that DLCA performed no work

in the past year. Ex. 6, at 2. The March 23, 2021 termination letter was the first time that

Transform notified DLCA of the termination of the Advertising Agreement. ECF No. 47, at 51;

ECF No. 50, at 51. DLCA was never notified prior to the March 23, 2021 letter that it had

breached the Advertising Agreement or that it would not be paid. ECF No. 47, at 51. While

Mr. Cruz signed the termination letter, he did not write the letter himself and did not make the

decision whether to terminate the Advertising Agreement. ECF No. 50, at 51-52.

### H. DLCA's Statement of Accounts

In its request for prejudgment attachment, DLCA claims it is owed $699,999.96 in unpaid

Agency Fees for the months of April, May, June, July, August, September, October, November,

December 2020 and January, February, March 2021. ECF No. 42, at 48. A statement of accounts

from September 30, 2019 to February 1, 2021 represents outstanding invoices issued by DLCA

to Transform during that time period. Ex. 5; ECF No. 47, at 89. According to the statement of

accounts, Transform owes $641,663.00 in outstanding Agency Fees to DLCA from April 2020

through February 2021. Ex. 5, at 3; Ex. 7.

DLCA also claims it is owed $15,531.34 for improper prompt payment discounts taken

on format work invoices dated September 30, 2019 to January 23, 2020. ECF No. 42, at 48; ECF

No. 47, at 39-40, 112; Ex. 5, at 3; Ex. 8 B, at 1-135. In June 2020, Transform entered into a

payment plan with DLCA for certain unpaid Agency Fee invoices and format work invoices

dated from September 2019 to March 2020. ECF No. 47, at 39-40.[15] The payment plan provided

that Transform would make ten payments between July 3, 2020 and November 20, 2020 totaling

$1,265,620.00. ECF No. 49, at 66-67; Ex. I-2. Transform paid 100% of the Agency Fee invoices

under the payment plan but only 98.75% of the format work invoices because it applied a 1.25%

prompt payment discount. ECF No. 47, at 112; ECF No. 47, at 91-95, 251-52; ECF No. 48, at

---

[15] DLCA is not seeking a prejudgment attachment of these Agency Fees. Instead, it is seeking prejudgment attachment of the Agency Fees from April 2020 to March 2021.

59; Ex. 8 B, at 1-135.[16] The statement of accounts reflects that Transform owes $15,531.34 for unauthorized prompt payment discounts. Ex. 5, at 3; Ex. 8 B, at 1-135.

At the hearing, Ms. Peña testified that the format work invoices dated from September 30, 2019 to January 23, 2020 were paid by Transform. Ex. 8 B, at 1-135; ECF No. 48, at 161. Nevertheless, on cross-examination Ms. Peña acknowledged that she was relying on annotations on the invoices "because they all have a notation that the payment was made either by ACH or wire." ECF No. 48, at 161. Ms. Peña further testified that she was relying on the annotations on the invoices to confirm they were paid "because it would be impossible for me to remember when each payment was made and when the check was processed." ECF No. 48, at 162. However, Ms. Peña testified that she was unsure of whether the amounts specified in the invoice balance annotations on the same invoices were correct. ECF No. 48, at 162.

If Ms. Peña's testimony was meant to asset that the format work invoices from September 30, 2019 to January 23, 2020 were paid in full, then her testimony is not credible for two reasons. First, the annotations regarding check number, check date, and invoice balance were placed on the invoices by DLCA, not Transform, so Ms. Peña could not have seen these annotations previously. Second, Ms. Peña may not rely on the annotations regarding check number and check date to assert that the invoices were paid while simultaneously claiming that she is unsure of the reliability of the annotations pertaining to invoice balances. No evidence was presented at the hearing that Transform had in fact paid more than 98.75% of the amounts in the format work invoices dated September 30, 2019 to January 23, 2020.

---

[16] Exhibits 8 A and 8 B were entered into evidence with the stipulation that "as to the first 135 pages in those exhibits, the portion that says partial payment, cash discount taken out of due date, check numbers, check date, and invoice balance, was not something that was included in the invoices sent to Transform." ECF No. 48, at 15.

Lastly, in its request for prejudgment attachment, DLCA claims that it is owed $9,599.31 from Transform for its failure to pay format work invoices dated February 28, 2020 to August 20, 2020. ECF No. 42, at 48-49; Ex. 5, at 3. The statement of accounts shows that Transform owes $9,559.31 for "all other invoices." Ex. 5, at 3; Ex. 8 B, at 136-181. Ms. Vega clarified that "all other invoices" refers to invoices for miscellaneous services related to materials, pictures, internet services, or production that have not been paid. ECF No. 47, at 253. According to Ms. Vega, these format work invoices were issued by the DLCA accounting department and sent to Transform but no payments have been received. ECF No. 47, at 5-6, 16; ECF No. 48, at 17, 19, 28-29.

### I. Operations

### 1.    Transform Midco's Operations

According to Mr. Keith Stopen ("Mr. Stopen"), director of finance for external reporting for Transform Midco, Transform Midco pays all the vendors for Sears and Kmart stores from one central account. ECF No. 50, at 66-68. This central account is supplied by all streams of revenue including its stores, online orders, and real estate. ECF No. 50, at 70. Transform Midco also derives revenue from licensing agreements including the licensing of the Kenmore name which is a proprietary brand of Transform Midco. ECF No. 50, at 71. Mr. Stopen clarified that the payment of vendors is not contingent on the revenue from the specific store that is being charged by the vendor. ECF No. 50, at 67-68. For the past two years, approximately four to six million dollars has been debited per business day from the central account, excluding payroll costs. ECF No. 50, at 68-69, 74. However, in years prior the amount being debited from the central account may have been as high as nine million dollars per business day. ECF No. 50, at

69. Mr. Stopen testified that he is not aware of when a vendor has not been paid due to liquidity issues. ECF No. 50, at 74.

Mr. Stopen informed that one of his duties is calculating the disposal costs for closing stores. ECF No. 50, at 73. Disposal costs are the amounts owed to employees for accrued severances and also future rent payments owed to landlords of the closing store. ECF No. 50, at 75. The disposal costs are usually requested from him about three to six months in advance of a store closing. ECF No. 50, at 72. Disposal costs have not been requested for the remaining Sears and Kmart stores currently in Puerto Rico. ECF No. 50, at 73. In the last three years the disposal costs of the Kmart and Sears stores that have closed in Puerto Rico have been approximately $90,000 for accrued severance per store and $11,000,000 for rent costs. ECF No. 50, at 75-76. Mr. Stopen conceded that disposal costs would be considered liabilities and could drive liabilities to exceed the assets of a closing store. ECF No. 50, at 78-80.

### 2.    Transform SR's and Transform KM's Operations in Puerto Rico

At the beginning of 2020, Transform underwent a restructuring in Puerto Rico that ended weeks before the commencement of the pandemic. ECF No. 49, at 23; ECF No. 50, at 5-6. During the restructuring, the names of positions changed, responsibilities were consolidated, and some positions were eliminated. ECF No. 50, at 6. Mr. Cruz explained that the purpose of the restructuring was to increase the effectiveness of personnel. ECF No. 50, at 9.

The rent for both Sears stores in Plaza Las Américas is $112,000 monthly and is currently up to date. ECF No. 49, at 13, 20. The Sears store in Naranjito has a monthly rent of $25,000 which is also up to date. ECF No. 48, at 110. The Sears store in Plaza Las Américas currently averages $300,000 in sales per week. ECF No. 49, at 14, 19. Transform SR had approximately $17,000,000 in assets as of May 1, 2021. ECF No. 50, at 62-63. Around half of Transform SR's

assets are classified as inventory that is not encumbered. ECF No. 50, at 64-65. Transform SR's liabilities are approximately seventy-five to eighty percent of its assets. ECF No. 50, at 63. Transform SR's volume of business in Puerto Rico for fiscal year 2018 was $69,000,000.[17] ECF No. 48, at 102, 142. However, Transform SR's volume of business in Puerto Rico has decreased since 2018. ECF No. 48, at 141.

      The monthly rent for the Kmart store is $125,000 which is currently up to date. ECF No. 49, at 13, 20. The Kmart store averages $230,000 to $250,000 in sales per week. ECF No. 49, at 14. As of May 1, 2021, Transform KM had between thirteen and fourteen million dollars in assets in Puerto Rico. ECF No. 50, at 61-62. Transform KM's assets are approximately equal to its liabilities in Puerto Rico. ECF No. 50, at 63-64. Transform KM's volume of business in Puerto Rico for fiscal year 2018 was 28 million dollars but its volume of business has decreased since 2018. ECF No. 48, at 102, 139-40. Transform KM suffered losses in Puerto Rico for fiscal years 2019 and 2020. ECF No. 50, at 84-85.

      Mr. Cruz testified that Transform recorded losses in fiscal year 2019. ECF No. 50, at 19. Then, Mr. Cruz testified that Transform had actually recorded earnings in fiscal year 2019 but that said earnings were less than the earnings for fiscal year 2018. ECF No. 50, at 19-20. Mr. Cruz's testimony is inconsistent with Mr. Stopen's testimony that he had access to the P&L statements and that Transform SR and Transform KM both recorded losses for fiscal year 2019. ECF No. 50, at 84-86. Mr. Cruz's varying recollections regarding fiscal year 2019 compared to Mr. Stopen's unwavering testimony makes Mr. Cruz's assertion that Transform recorded earnings in fiscal year 2019 not credible.

---

[17] Ms. Peña clarified that the volume of business for 2018 refers to the amount of revenue that was reported in the volume declaration returns to the Puerto Rico Treasury Department. ECF No. 48, at 137. Transform has never defaulted in tax payments. ECF No. 47, at 107-08.

According to Mr. Cruz, the net sales for Transform as of May 2021 is nineteen million dollars and the "cost of sale" is approximately thirteen million dollars.[18] ECF No. 50, at 16, 17. Thus, to date, Transform has had around six million dollars in "gross profit," yet at the same time Mr. Cruz testified that Transform has "losses" for the year 2021. ECF No. 50, at 17, 18.

Transform SR also derives revenue from licensed business. ECF No. 49, at 15. Licensed business refers to space that is rented out within the store to outside entities. ECF No. 49, at 15. Licensed entities include, among others, AT&T, Claro, Travel with Sears, and Ponderosa restaurant. ECF No. 49, at 15-17. These licensed entities pay fixed rent or a percentage of sales to Transform. ECF No. 49, at 16. The income per business from these licensed entities could be as low as $1,200 and as high as $15,000 a month. ECF No. 49, at 17. Some of the licensed entities pay Transform SR directly and other licensed entities pay corporate headquarters. ECF No. 49, at 17. Mr. Cruz clarified that although some of the licensed entities pay corporate headquarters, the funds are ultimately entered into the profit and loss ("P&L") statement for Transform in Puerto Rico. ECF No. 49, at 17-19. However, Mr. Cruz was unsure whether the money from licensed entities is automatically transferred from corporate headquarters to Transform SR. ECF No. 49, at 19.

Transform owns the real estate in Fajardo where the Sears and Kmart stores were previously located before they closed. ECF No. 48, at 111; ECF No. 49, at 16. The real estate in Fajardo is being rented to Auto Advance. ECF No. 49, at 16. In addition to brick and mortar sales and licensed business, Transform also derives revenue from commercial sales and its repair business. ECF No. 49, at 20-21. Since its acquisition of the Sears' assets through the Sears

---

[18] This figure also includes the four Kmart stores in the USVI. ECF No. 50, at 16.

Bankruptcy, Transform SR and Transform KM have not issued a single audited financial statement. ECF No. 50, at 82-83.

## IV.    Legal Analysis

### A. Whether DLCA Has Demonstrated a Likelihood of Success on the Merits of its Breach of Contract Claim

#### 1.    Agency Fees

DLCA alleges that Transform is liable under breach of contract for failing to comply with its obligations under the Advertising Agreement. ECF No. 42, at 48-49. "Under Puerto Rico law, a claim for breach of contract has three elements: (1) a valid contract; (2) a breach by one of the parties to the contract; and (3) resulting damages." Yacht Caribbean Corp. v. Carver Yacht LLC, 270 F. Supp. 3d 547, 555 (D.P.R. 2017). "Puerto Rico law makes clear that contracts shall be binding, regardless of the form in which they were executed, 'provided the essential conditions required for their validity exist.'" Markel American Ins. Co. v. Diaz-Santiago, 674 F.3d 21, 31 (1st Cir. 2012) (citing 31 L.P.R.A. § 3451).

> Where the terms of a contract are clear, leaving no doubt as to the contracting parties' intentions, such contract will be observed according to "the literal sense of its stipulations." It is widely accepted that "[o]bligations arising from contracts have legal force between the contracting parties, and must be fulfilled in accordance with their stipulations."

Id. (citing 31 L.P.R.A. §§ 3471, 2994).

"The Puerto Rico Supreme Court has held that '[w]hen the breach of a contractual obligation causes harm to any of the contracting parties, an action for damages for breach of contract lies.'" Redondo Const., Co. v. Izquierdo, 929 F. Supp. 2d 1, 12 (D.P.R. 2012) (quoting Soc. de Gananciales v. Vélez & Asoc., 98 P.R. Offic. Trans. 54 (P.R. 1998)); Markel American Ins. Co., 674 F.3d at 31 ("Where a party fails to uphold or abide by the contract's essential obligations, such failure will be deemed a breach of the contract."). "When a party breaches a

contract, it 'is liable to the aggrieved party for damages which were foreseen or may have been foreseen.'" Redondo Const., Co., 929 F. Supp. 2d at 12 (quoting Oriental Fin. Group, Inc. v. Fed. Ins. Co., 483 F. Supp. 2d 161, 165 (D.P.R. 2007)).

DLCA and Transform entered into a valid contract when they signed the Third Amendment on April 12, 2019 whereby Transform assumed the Original Agreement, as amended. Ex. 4. DLCA claims that Transform breached the Advertising Agreement since it has failed to pay Agency Fees from April 2020 through March 2021. ECF No. 42, at 24-25, 48.

Transform makes several arguments as to why DLCA is not entitled to the payment of Agency Fees after March 2020. First, Transform argues that DLCA did not perform agency services under the Advertising Agreement after March 15, 2020. ECF No. 43, at 3. Transform also argues that the COVID-19 pandemic was a force majeure event, that under the Advertising Agreement, necessarily and significantly reduces DLCA's claim for Agency Fees. Id. at 17. Next, Transform contends that the application of the doctrine of *rebus sic stantibus* precludes DLCA "from claiming the payment of the Agency Fees for months during which no agency services were performed." Id. at 11. It is also argued by Transform that DLCA's failure to submit a new proposal for Agency Fees for 2020 renders its claim for prejudgment attachment unsustainable. Id. at 16. Furthermore, Transform argues that DLCA stood idle for eleven months and did not make meaningful efforts to collect the Agency Fees at issue, and thus, is not entitled to prejudgment attachment on an urgent and expedited basis. Id. at 12.

### a.    Whether the Payment of Agency Fees is Contingent on the Level of Agency Services

Transform argues that the payment of the Agency Fees "undeniably is linked to and dependent upon Plaintiff actually providing services to Transform." ECF No. 24, at 6. DLCA, Transform claims, did not perform any agency services under the Advertising Agreement after

March 15, 2020. ECF No. 43, at 3. Transform also argues that the only evidence presented by DLCA regarding "the alleged 'work' done for Transform after the pandemic consists of email exchanges concerning *de minimis* tasks related to social media, preparing in store banners, and a 'job list' outlining those tasks." ECF No. 43, at 4.

The Advertising Agreement provides that "[Transform] shall pay [DLCA] a fee ("Agency Fee") for Agency Services as set forth in Exhibit E." Ex. 1, at 7, ¶ 4.1. The latest agency services provision of the Advertising Agreement provides that "[DLCA] agrees to perform the services listed and to conform to the highest professional standards in carrying out its responsibilities and in all dealings with [Transform] and anyone associated with [Transform]. . . " Ex. 3, at 5, A-1. The Advertising Agreement also provides that the Agency Fee "shall be payable in consecutive monthly installments becoming due in advance on the first business day of each month" and that "the monthly installments shall be in the amount of $58,333.33 each." Ex. 3, at 2-3, ¶ 5.

The problem with Transform's first argument is that it is premised on the notion that the fixed Agency Fees due every month are in consideration for performance of every single service that appears listed in Exhibit E of the Advertising Agreement every single month of the year. Ex. 3, at 5, A-1. The agency services provision of the Advertising Agreement, however, does not specify that DLCA was obligated to perform all of the agency services in a given month. The agency services provision simply provides that DLCA "agrees to perform the services listed . . ." Ex. 3, at 5, A-1. The contract, however, is silent as to when throughout the year those services must be performed.[19] Furthermore, the fact that the Agency Fee is payable "*in advance* on the first business day of each month" (emphasis ours), shows that the payment for a given month

---

[19] Except for example, see item L on Exhibit 3, at 5, A-1, where DLCA was required to assign a minimum of twelve hours monthly for promotional planning . . . "as per Sears request."

was not dependent on whether DLCA rendered any particular agency service. Additionally, the Agency Fee amount does not vary month to month depending on the amount of agency services performed because payment was made in equal monthly installments. In fact, DLCA never provided all agency services every month, because the services were provided based on the volume that Transform had, or the needs that Transform would have each month based on seasonality considerations. ECF No. 47, at 34-36. Furthermore, DLCA has never been paid more or less than the agreed monthly Agency Fee amount depending on the services that were actually rendered by DLCA. ECF No. 47, at 128-29.

Moreover, DLCA was not required under the Advertising Agreement, and was never required by Transform, to present any supporting documentation or a description of work performed for such Agency Fee payment. ECF No. 47, at 32-38; ECF No. 48, at 155-57. Nor was DLCA obligated under the Advertising Agreement, nor requested by Transform, to include the number of hours of agency services performed in a particular month in the invoices for Agency Fees. ECF No. 48, at 155-57. Format invoices, on the other hand, were accompanied with supporting documentation of the specific work that was performed. ECF No. 48, at 126-27. The fact that Agency Fee invoices were paid in advance, never accompanied by supporting documentation, did not include a description of work performed or hours worked, and that DLCA was never paid more or less than the monthly Agency Fee amount unequivocally shows that the payment of Agency Fees was not contingent on the performance of specific agency services on any given month.

Transform's contention that the work produced by DLCA during the pandemic did not constitute agency services under the Advertising Agreement also falls short. ECF No. 43, at 4. Although Transform did not purchase advertisements for shoppers, ROPs, billboards, radio, print

media, or television after March 2020, DLCA continued to perform work for Transform after said date. The evidence introduced at the evidentiary hearing reflects that DLCA continued to produce artwork and copy for social media posts for Facebook and responded to customer inquiries until September 2020. DLCA also worked on advertisements for Transform that were published in El Nuevo Día (redeeming credits that it had with said newspaper) and produced various signage for stores. Agency services also included, among others, keeping current with Transform's product and service information; creating, preparing, and submitting for Transform's approval advertising ideas and programs; and executing advertising in finished form in accordance with Transform's instructions. See Ex. 3, at 5, A-1. The production of artwork and copy for advertisements for Facebook, El Nuevo Día, and store signage, as well as Mr. Rivera's monitoring of Transform's business certainly qualifies as agency services.

Transform argues that under the Second Amendment, one of the agency services that DLCA was obligated to perform was "to assign a minimum of 12 hours monthly for promotional planning, development, implementation and execution, of promotional events or sponsorships." ECF No. 43, at 19. Transform further argues that DLCA "did not present any evidence to support that it met this minimum of monthly hours – or, indeed, any number of hours – to generate agency fees." Id. Transform, however, omits the complete sentence regarding the agency services listed in Subsection L of the Second Amendment which states, in its entirety, that DLCA was "to assign a minimum of 12 hours monthly for promotional planning, development, implementation and execution, of promotional events or sponsorships *as per Sears [now Transform's] request.*" Ex. 3, at 5, A-1 (emphasis ours). Transform has not cited to any evidence from the evidentiary hearing that after March 2020, DLCA was requested in any particular month to assign twelve hours to promotional planning but failed to do so.

Transform also argues that requiring it to "pay $58,333.00 per month as a fixed fee for the *de minimis* amount of work done by [DLCA] from April 2020 up until September 15, 2020 contravenes the plain language of the [Advertising Agreement] as well as the most basic notions of fairness and justice." ECF No. 43, at 10. Regardless of whether the work performed by DLCA after March 2020 can properly be characterized as *de minimis*, it is evident that charging almost $700,000 in fixed Agency Fees for the significantly reduced quantity of work done by DLCA during said period of time is borderline unconscionable. Nevertheless, Transform's criticism that the Advertising Agreement is unfair cannot overcome the doctrine of *pacta sunt servanda* that "generally holds parties to strict compliance with the terms of their bargain." William L. Bonnell Co., Inc. v. Gandara, 714 F. Supp. 2d 272, 274 (D.P.R. 2010); see Chambers Dev. Co., Inc. v. Passaic County Utilities Auth., 62 F.3d 582, 589 (3rd Cir. 1995) ("Freedom of contract includes the freedom to make a bad bargain. 'It is a fundamental principle of contract law, therefore, that, wise or not, a deal is a deal.'" (citations omitted)).

Moreover, if Transform no longer wanted to be obligated to pay the Agency Fee, it had an obvious solution: terminate the Advertising Agreement. As established by the evidence and testimony presented during the hearing, the Advertising Agreement contained a provision that "[e]ither party may terminate the Agreement, with or without cause; by giving the other party at least ninety (90) days' prior written notice." Ex. 1, at 9, ¶ 5.3. The Advertising Agreement also provided that, "[u]pon termination, [Transform] shall be liable to pay only for Agency Services actually rendered prior to the effective date of termination, which shall in no event be greater than the pro rata portion of the Agency Fee as set forth in Exhibit E."[20] Ex. 1, at 10, ¶ 5.6. Thus,

---

[20] The "actually rendered" language only appears in the termination provision of the Advertising Agreement, as explained by Mr. Thompson. Transform has not presented any evidence to the contrary. Ex. 1, at 10, ¶ 5.6; ECF No. 47, at 69.

Transform could have easily, and in a non-costly manner, exercised its rights under the Advertising Agreement to terminate the contract by sending a written termination notice to DLCA.

In April 2020, Mr. Cruz called Mr. Thompson to inform him that Transform would not be doing any more marketing because the marketing department at Transform was furloughed. However, the mere fact that Mr. Cruz informed Mr. Thompson that Transform would not be doing any more marketing is not synonymous with terminating the Advertising Agreement. In other words, a pause in marketing—perhaps due to the uncertainty caused by the COVID-19 pandemic—not necessarily precludes the resumption of such endeavor later in the year. In fact, Mr. Cruz conceded that although he told Mr. Thompson to stop work in April 2020, "[t]he agreement with DLCA was not terminated." ECF No. 50, at 31. Mr. Cruz further conceded that a written termination notice was not sent to DLCA until March 23, 2021. ECF No. 50, at 51.

The record evidence also reflects that Transform knew about the Agency Fees and termination provisions in the Advertising Agreement well before it sent the March 23, 2021 termination letter. Mr. Cruz testified that he knew about the Agency Fee provision in the Advertising Agreement "since 2019." ECF No. 50, at 28-29. Thus, Mr. Cruz, as market leader and high-ranking manager for Transform in Puerto Rico, could have notified the Transform team in Chicago regarding the accruing Agency Fees when the pandemic began. However, no evidence was presented at the hearing that Mr. Cruz did anything to that effect. Nonetheless, Mr. Thompson advised Mr. Cruz regarding the termination provisions through the October 23, 2020 email, which Mr. Cruz testified that he forwarded to the Transform team in Chicago. Ex. 38; ECF No. 50, at 45-46. Hence, the Transform team in Chicago was on notice since at least

October 2020 of the procedure for terminating the Advertising Agreement. ECF No. 50, at 45-46. However, no written termination notice was issued at that time.[21]

On December 23, 2020, Mr. Thompson sent an email to Mr. Cruz indicating that Transform owed various amounts including certain unpaid Agency Fees. Ex. 39. Yet, no written termination notice was issued. On February 9, 2021, Ms. Vega sent an email to Mr. Cruz, and others, containing the audit letter from RSM requesting that Transform verify four outstanding invoices including three invoices for Agency Fees for October, November, and December 2020. Ex. 34. Thus, once again, Mr. Cruz was reminded that Agency Fees were accruing. Instead, Transform, which is not an unsophisticated party, waited until March 23, 2021 to send the written termination notice to DLCA. If Transform so firmly believed that paying the Agency Fee provision of the Advertising Agreement after March 15, 2020 when the pandemic began was unfair and excessive, it had plenty of opportunities to terminate the contract. Instead, Transform chose to idly wait until more than a month after it got sued to terminate the Advertising Agreement.

      **b.**      **Whether Transform's Obligation to Pay Agency Fees is Excused Under the Force Majeure Clause in the Advertising Agreement**

Transform argues that it is relieved from liability under Article 1058 of the Puerto Rico Civil Code which provides that "[n]o one shall be liable for events which could not be foreseen, or which having been foreseen were inevitable, with the exception of the cases expressly mentioned in the law or those in which the obligation so declares." 31 L.P.R.A. § 3022.

---

[21] In the October 23, 2020 email Mr. Thompson states that "[i]f there was a decision to change the contract agreement or cancel the contract, even in COVID days, we had to receive a 30 day cancellation letter . . ." Ex. 38. It is unclear where the 30-day term comes from, as the Original Agreement, subsequently incorporated as amended in the Advertising Agreement, requires "giving the other party at least ninety (90) days prior written notice." Ex. 1, at 9, ¶ 5.3. Perhaps Mr. Thompson was alluding to the 30-day provision in the Force Majeure clause of the Advertising Agreement. Ex. 1, at 22, ¶ 21. Ultimately, this discrepancy is immaterial to the analysis as Transform did not give any 30 or 90 day written termination notice until March 23, 2021.

Transform specifically argues that the COVID-19 pandemic constituted a force majeure, and thus, its obligations to pay the Agency Fee were obviated as result. Section 21 of the Advertising Agreement, titled "Force Majeure", provides that

> Neither [Transform] nor [DLCA] shall be liable to the other for any failure, inability or delay in performing hereunder if caused by any cause beyond the reasonable control of the party so failing, including without limitation, an Act of God, war, strike or fire; but due diligence shall be used in curing such cause and in resuming performance.

Ex. 1, at 22, ¶ 21. The Advertising Agreement also provides that "[i]n addition, the Agency Fee . . . shall be equitably reduced to reflect the services that were not provided by [DLCA]. In the event performance is not resumed within thirty (30) days, the nonfailing party may terminate this Agreement immediately upon written notice." Id. Thus, Transform argues that any obligation to pay Agency Fees after March 2020 is excused because "the rise of the pandemic, and the subsequent disruption of all commercial activity in Puerto Rico until at least June 2020 was an inevitable event that could not have possibly been foreseen by the parties." ECF No. 22, at 8. On the other hand, DLCA argues that "Transform's allegation that the force majeure clause of the Advertising Agreement allows it to equitably reduce the amounts owed to DLCA hinges on the incorrect assumptions that, first, the COVID-19 pandemic is the type of event contemplated therein and, second, that such event excused Transform's silence as an alleged justification for its failure to pay, notwithstanding the fact that the same clause stated that 'due diligence shall be used in curing such cause and in resuming performance.'" ECF No. 23, at 9.

"A force majeure is often a natural phenomenon, such as a natural disaster, but unforeseeable human events, such as war, may also constitute force majeure." Bancrédito Int'l Bank Corp. v. Data Hardware Supply, Inc., Civ. No. 18-1005, 2019 WL 4458839, at *2 (D.P.R. Sept. 13, 2019). "To determine whether an event constitutes a force majeure, courts consider the

frequency or probability of the event, whether the event was unusual, and whether precautions were taken in anticipation of the event." La Carpa Corporation v. American Spaceframe Fabricators, LLC, Civ. No. 09-2014, 2014 WL 128892, at *6 (D.P.R. Jan. 25, 2014).

Various courts have determined that the COVID-19 pandemic may constitute a force majeure event that could relieve a party of its contractual obligations. See 1600 Walnut Corp., Genera Partners of L-A Walnut, LP, v. Cole Haan Co. Store, Civ. No. 20-4223, 2021 WL 1193100, at *3 (E.D. Penn. Mar. 30, 2021) ("The COVID-19 pandemic is an event covered in the force majeure clause."); JN Contemporary Art LLC v. Phillips Auctioneers LLC, Civ. No. 20-4370, 2020 WL 7405262, at *7 (S.D.N.Y. Dec. 16, 2020) ("It cannot be seriously disputed that the COVID-19 pandemic is a natural disaster."). However, regardless of whether the COVID-19 pandemic could in some scenarios be deemed to be a force majeure, Transform has not established a causal nexus between its failure to pay Agency Fees and the COVID-19 pandemic.

"[I]n order to constitute a force majeure, an event must be the proximate cause of nonperformance of the contract." 1600 Walnut Corporation, 2021 WL 1193100, at *3; see also Future Street Limited v. Big Belly Solar, LLC, Civ. No. 11020, 2020 WL 443174. at *6 (D. Mass. July 31, 2020) ("Even assuming arguendo that the pandemic and effects of same are a force majeure under the Agreement, Future Street has not shown that its failure to perform its obligations under the Agreement were caused by [the pandemic]. . . "); Hong Kong Islands Line America S.A. v. Distribution Services Ltd., 795 F. Supp. 983 (C.D. Cal. 1991) ("It is well-established that in order to constitute a force majeure, an event must be the proximate cause of nonperformance of the contract."). Transform has not cited to any record evidence that the COVID-19 pandemic constituted the proximate cause of its failure to pay Agency Fees.

Mr. Thompson and Mr. Cruz both testified that Transform continued to operate during the pandemic, albeit with some significant limitations. ECF No. 47, at 62-63; ECF No. 49, at 15. Furthermore, the record evidence reflects that DLCA continued to perform work during the pandemic with Transform's consent and as many as sixty jobs were completed between March 15, 2020 and September 15, 2020. Ex. 37.

Additionally, as stated earlier, if Transform no longer wanted to be obligated to pay the Agency Fee, it could have sent a written termination notice to DLCA before March 23, 2021. Instead, after the pandemic began, Mr. Cruz was informed of DLCA's insistence on accruing Agency Fees, first in October 2020, then in December 2020, and again in February 2021. If Transform understood that it was unable to satisfy its obligations and believed that the COVID-19 pandemic constituted a force majeure event, it could have exercised its rights under the termination provisions of the Advertising Agreement or invoked the force majeure clause in a timely manner.

### c.    Whether Transform's Failure to Pay Agency Fees is Excused Under the Doctrine of *Rebus Sic Stantibus*

Transform also argues its obligation to pay Agency Fees is excused under the doctrine of *rebus sic stantibus*. ECF No. 22, at 9. "The doctrine of *rebus sic stantibus* is not expressly included in the Puerto Rico Civil Code, but is an equitable principle 'deemed implicit in contracts and that serves to adjust the debtor's obligation or rescind the contract when unforeseeable circumstances render strict compliance with the contract unfair.'" La Carpa Corp. v. American Spaceframe Fabricators, LLC, Civ. No. 09-2014, 2014 WL 128892, at *6 (Jan. 25, 2014) (quoting López Morales v. Hosp. Hermanos Meléndez, Inc., 460 F. Supp. 2d 288, 291 (D.P.R. 2006)). "*Rebus sic stantibus* is an 'exceptional remedy to extraordinary circumstances.'" Id.; see In re Chase Monarch Int'l Inc., 433 F. Supp. 3d 255, 259 (D.P.R. 2019) ("the doctrine of

*rebus sic stantibus* is an extraordinary remedy 'which should be employed only in exceptional instances requiring a judicious and scrupulous moderating judicial discernment.'" (citations omitted)).

"For the doctrine to apply, there must be: (1) a contract whose execution, in whole or in part, is not yet complete, (2) that after the parties entered into the contract, (3) an unforeseeable event of some permanence occur, (4) that as a result thereof, performance by the promisor is made significantly more burdensome or costly, (5) an absence fraud or deceit by the parties, and (6) the aggrieved party move the court for relief." La Carpa Corp., 2014 WL 128892, at *6. Transform argues that the requirements set forth for the *rebus sic stantibus* doctrine are met because

> (1) the pandemic was an unforeseeable event; (2) the pandemic generated extraordinary difficulty for Transform to perform under the Agreement's terms, as it was not doing any advertisement work and its marketing team was furloughed; (3) no such risk was contemplated in the contractual relationship between Transform and [DLCA]; (4) the parties did not engage in fraudulent acts; (5) the Agreement was one projected into the future with periodic installment payments; (6) the change of circumstances—namely, the pandemic —was subsequent to the execution of the Agreement, and (7) Transform is requesting the review of the Agreement's term.

ECF No. 43, at 12.

Transform's argument that the *rebus sic stantibus* doctrine applies to this case is untenable as it has not presented evidence how the COVID-19 pandemic rendered its performance under the Advertising Agreement more costly. The Agency Fee was payable in advance over equal monthly installments, so Transform's obligation to pay Agency Fees did not become more costly during the pandemic. See Ex. 3, 2-5, ¶ 5. Furthermore, regarding format work, the volume of work invoiced between September 2019 and through March 31, 2020 was higher than the work that was invoiced starting on April 30, 2020 through February 1, 2021. ECF

No. 47, at 95. While Transform was invoiced over one million dollars for format work by DLCA between September 2019 and March 2020, it was invoiced less than $7,000 for format work after the pandemic started. Ex. 5; Ex. 8, at 1-181. Thus, Transform actually incurred less commission related expenses during the pandemic period.

As stated earlier, if Transform believed that its obligations under the Advertising Agreement were made too onerous due to the pandemic, it should have promptly sent a written termination notice to DLCA. However, Transform chose not to send a written notice terminating the Advertising Agreement until March 23, 2021. Ex. 6. Transform's failure to terminate the Advertising Agreement promptly considered alongside the fact that DLCA continued to produce work, with Transform's consent, until at least September 15, 2020, renders Transform's assertion that the doctrine of *rebus sic stantibus* relieves its obligations under the contract unsustainable.

### d.    Whether the Absence of a New Proposal for Agency Fees for 2020 Renders DLCA's Request for Prejudgment Attachment Without Merit

Transform argues that DLCA may not request prejudgment attachment of 2020 Agency Fees because DLCA never submitted a proposal for the renegotiation of agency fees corresponding to the 2020 calendar year. ECF No. 43, at 16. The Advertising Agreement provides that "[p]rior to the conclusion of each calendar year during the Term, [DLCA] shall submit a proposal and shall thereafter negotiate with [Transform] the compensation to be paid to [DLCA] for its services during the next calendar year of the Term." Ex. 1, at 8, ¶ 4.7. DLCA did not submit a proposal for Agency Fees to Transform in 2019 or 2020. ECF No. 47, at 77; ECF No. 49, at 71.

However, the mere fact that DLCA did not submit a proposal for Agency Fees corresponding to the 2020 calendar year is insignificant. The Advertising Agreement specifically provides that "[i]f the Agency Fee is not agreed upon prior to the beginning of the next calendar

year, [Transform] shall continue to pay a monthly fee in the amount of 1/12th of the prior year's

Base Fee (as defined in Exhibit E) until the negotiated Agency Fee is finalized with retroactive

adjustment or until this Agreement is terminated, whichever occurs first." Ex. 1, at 8, ¶ 4.7. The

last agreed upon Agency Fee was set at an annual amount totaling $700,000, paid in monthly

installments of $58,333.33 on the first business day of each month. Ex. 3, at 2-3, ¶ 5. It is

undisputed that a new negotiated Agency Fee for the 2020 calendar year was not finalized and

that a written termination notice was not sent until March 23, 2021. Therefore, Transform was

obligated to continue paying a monthly Agency Fee in the amount of $58,333.33.

### e.  DLCA has Demonstrated a Likelihood of Success on the Merits that it is Entitled to Payment of Outstanding Agency Fees

As previously discussed, according to the Advertising Agreement, termination of said

contract becomes effective ninety days after written notice is provided. Ex. 1, at 9, ¶ 5.3. It is

undisputed that Transform did not send a written termination notice to DLCA until March 23,

2021. Ex. 6; ECF No. 47, at 51; ECF No. 50, at 51. Therefore, the Advertising Agreement does

not expire until June 21, 2021 which is ninety days after the termination notice was sent by

Transform. Hence, for the reasons stated earlier, Transform was still obligated under the

Advertising Agreement to continue paying Agency Fees to DLCA until the termination became

effective. However, Transform has not made payments on Agency Fee invoices after March

2020. Because Transform was still obligated to pay Agency Fee and its arguments that it should

be excused from its obligations are unpersuasive, DLCA has shown a likelihood of success on

the merits that Transform is liable under breach of contract and that it is entitled to the payment

of Agency Fees totaling $699,999.96 for April, May, June, July, August, September, October,

November and December 2020 and January, February, March 2021.

2.        **Unauthorized Prompt Payment Discount**

DLCA claims that Transform breached the Advertising Agreement when it improperly

applied the 1.25% prompt discount payment on format work invoices dated September 30, 2019

to January 23, 2020. ECF No. 42, at 24-25; Ex. 5; Ex. 8 B, at 1-135. DLCA contends that it is

entitled to the payment of $15,531.34 from Transform for improper prompt payment discounts

on said invoices. ECF No. 42, at 48-49. As stated previously, the Advertising Agreement

provided that Transform would receive a prompt payment discount of 1.25% on format work

invoices provided that full payment was made within ten calendar days from the date that the

invoices were delivered to Transform. Ex. 1, at 11, ¶ 6.5; Ex. 4, at 2, ¶ 6. However, none of the

format work invoices dated September 30, 2019 to January 23, 2020 indicate that payment was

made within ten calendar days. See Ex. 8 B, at 1-135; ECF No. 48, at 19, 28-29, 58-59.

Transform argues that it should not be required to pay the balance amounts reflected on

the format work invoices from September 30, 2019 to January 23, 2020 because it never received

invoices for those amounts. ECF No. 43, at 19-20. At the hearing, Ms. Vega specifically testified

that these invoices were issued by the accounting department at DLCA and sent to Transform.[22]

ECF No. 48, at 5-6. Ms. Vega also testified that DLCA received a partial payment on the

invoices and that Transform had in fact paid 98.75% of said invoices. ECF No. 48, at 28, 59; Ex.

8, at 1-135. Ms. Vega explained that there are still outstanding balances on the invoices because

Transform took an unauthorized prompt payment discount of 1.25%. ECF No. 48, at 58-59.

Therefore, Transform's contention that it never received the invoices dated September

30, 2019 to January 23, 2020 is undermined by the fact that it has actually already paid 98.75%

---

[22] Ms. Vega did not specify whether the format work invoices dated September 30, 2019 to January 23, 2020 were sent to Transform via messenger or email. However, prior to the pandemic, DLCA sent invoices to Transform via messenger. Therefore, because all of these invoices are dated prior to the first government lockdown on March 15, 2020, a reasonable inference can be made that they were sent to Transform's regional office by messenger.

of the amounts owing on said invoices. To the extent that Transform is arguing that its obligation to pay the remaining 1.25% on the invoices is excused because DLCA did not send new invoices, the same is without merit. Transform has cited to no authority compelling DLCA to send new invoices every time a partial payment was applied. Thus, Transform's argument that it never received such invoices is indefensible.

Alternatively, Transform argues that DLCA's acceptance of the partial payments on the format work invoices dated September 30, 2019 to January 23, 2020 triggers the application of the accord and satisfaction doctrine, thus relieving it of any further obligations to pay said invoices. ECF No. 43, at 21. "Discharge by accord and satisfaction occurs upon the rendering of some performance different from that which was claimed as due and the acceptance of such substitute performance by the claimant as full satisfaction of the claim." Alvarez Díaz v. Air France, 787 F. Supp. 258, 260 (D.P.R. 1991). "In order for this doctrine to apply, the following requisites must be present: '(1) a claim which is unliquidated or concerning which a bona fide controversy exists; (2) an offer of payment by the debtor; and (3) an acceptance of the offer of payment by the creditor.'" Gastronomical Workers Union Local 601 v. Posadas de Puerto Rico Assocs., 544 F. Supp. 2d 89, 94 (D.P.R. 2008) (quoting H.R. Elec., Inc. v. Rodríguez, 114 D.P.R. 236, 240 (1983)); Corujo v. Eurobank, Civ. No. 4-2239, 2008 WL 11501529, at *6 (D.P.R. June 9, 2008). "The payment offer must be accompanied by acts or declarations which clearly denote that the offer made represents full, complete, and final payment of the existing debt. Similarly, the creditor's conduct must undoubtedly indicate that he has accepted the offer." Gastronomical Workers, 544 F. Supp. 2d at 94 (quoting H.R. Elec., 114 D.P.R. at 242).

In the present case, in June 2020, Transform entered a payment plan with DLCA for unpaid invoices for Agency Fees and format work that were issued between September 2019 and

March 2020. ECF No. 47, at 39. The payment plan provided that Transform would make ten

payments between July 3, 2020 and November 20, 2020 totaling $1,265,620.00. ECF No. 49, at

66-67; Ex. I-2. Mr. Thompson testified that Transform met the payment plan and that the only

amount that had not been paid was the unauthorized 1.25% prompt payment discount. ECF No.

47, at 111-12; ECF No. 48, at 57-58. Transform has not cited to any evidence indicating that

DLCA accepted payment of 98.75% due on the invoices as "full, complete, and final payment of

the existing debt." Gastronomical Workers, 544 F. Supp. 2d at 94. Instead, DLCA applied

Transform's partial payments to the applicable invoices and maintained in its statement of

accounts that amounts were still owing on said invoices. Ex. 5.

Transform argues that if DLCA believed the invoices had not been satisfied, it could have

included the invoices in its email communications to Transform, contacted Transform after the

payments were received to claim the difference on the amounts allegedly owed, or called

Ms. Peña to inquire about the alleged partial payments. ECF No. 43, at 22. Transform's

argument that DLCA could have engaged in email communications regarding these invoices falls

short in light of the fact that Ms. Vega never received any responses to her emails regarding the

payment of Agency Fee or format work invoices. ECF No. 48, at 21-24; Ex. 41 B. As previously

discussed, no evidence was presented at the hearing that Transform instructed DLCA how

invoices should be delivered following the furlough of the marketing department on April 15,

2020 even though it knew that Agency Fees were owed, in advance, every month.

Moreover, even when Ms. Peña specifically received an email from Ms. Vega regarding

the audit letter that included certain outstanding Agency Fee invoices, she did not process said

invoices. Nor did Ms. Peña respond to Ms. Vega's email. ECF No. 48, at 163, 166-168.

Transform's argument that its obligation to pay the remaining amounts due on the invoices at

issue was extinguished by accord and satisfaction is uncompelling. Thus, DLCA has also shown a likelihood of success on the merits that it is entitled to the payment of $15,531.34 for unauthorized prompt payment discounts. Ex. 5, at 3.

### 3.    Format Work Invoices

DLCA also alleges that it is entitled to the payment of unpaid format work invoices dated February 28, 2020 to August 20, 2020, in the amount of $9,559.31. ECF No. 42, at 24-25; ECF No. 48, at 16-17; Ex. 5, at 3; Ex. 8 B, at 136-181. The DLCA statement of accounts shows that Transform owes $9,559.31 for "all other invoices." Ex. 5, at 3. Ms. Vega clarified that "all other invoices" refers to invoices for miscellaneous services related to materials, pictures, internet services, or production that have not been paid. ECF No. 47, at 253. According to Ms. Vega, the invoices for these amounts were sent to Transform but DLCA has not received payment on said invoices. ECF No. 48, at 17.

However, the issue is whether Transform is relieved of its obligations to pay these format work invoices because DLCA was instructed to stop work. Mr. Cruz informed Mr. Thompson that DLCA should stop work sometime after April 15, 2020. However, the record reflects that DLCA continued receiving requests from Transform employees and Mr. Cruz was aware, at least in part, that DLCA continued to work. A review of the format work invoices after April 15, 2020 reveals invoices for Facebook, stand banners, roll up banners, Sears Auto banners and signage, among others. See Ex. 8-B, at 136-183. At the hearing, Mr. Rivera testified regarding certain email communications that appear to be related to said invoices, where Transform employees, such as Ms. Gómez and Mr. Bryan Soto, were communicating with Mr. Rivera regarding the matters referenced in the invoices. See Ex. 15 B; Ex. 18 B; Ex. 21 B; ECF No. 47, at 160-61, 173, 226-27.

Mr. Cruz was also included on several of these email communications. On May 14, 2020, at 12:46 PM, Mr. Rivera sent an email to Mr. Cruz informing that "[w]e are working the signage required for Sears Auto. We are going to have to do the same thing when the Sears stores open." Ex. 20 B.  Mr. Cruz responded, "yes thank you we will communicate soon." Id. On June 25, 2020, Mr. Rivera sent an email to Mr. Cruz informing "[t]he advertisements that you have on credit expire on June 30 so if Kmart or Sears wish to use them the moment is now." Ex. 23 B. On July 28, 2020, Mr. Rivera sent an email to various people, including Ms. Gómez and Mr. Cruz, regarding approval of an advertisement for no IVU tax-free days for Facebook and Instagram. Ex. 22 B; ECF No. 47, at 175-76. Ms. Gómez asked, "[Mr. Cruz] what do you think?" to which Mr. Cruz replied "perfect." Ex. 22 B. On August 10, 2020, Mr. Rivera sent an email to Mr. Cruz and Ms. Gómez informing that Mr. Edgardo Lebrón from the home improvement division from Sears wanted to publish content on the Sears Facebook page and that authorization from Mr. Cruz was needed. Ex. 30 B. Mr. Rivera also informed that "[w]e have no problem in working the posts but it does require approval from [Mr. Cruz]" and "someone has to give me the approval before working." Id. Mr. Cruz responded, "Yes please proceed [Mr. Rivera]." Id.

Thus, even though DLCA was requested to stop work sometime after April 15, 2020, the record reflects that Transform employees continued requesting and approving work done by DLCA which was known, in part, by Mr. Cruz. Hence, DLCA has shown a likelihood of success on the merits that it is entitled to payment of $9,559.31 for the format work invoices dated between February 28, 2020 to August 20, 2020. Ex. 5.

### B. Transform's Ability to Satisfy a Judgment

Having determined that DLCA's breach of contract claim is likely to succeed on the merits, the court must assess Transform's ability to satisfy a judgment against it. The evidence

presented at the evidentiary hearing shows that there is a nontrivial risk that DLCA would be unable to execute a judgment against Transform. Since 2016, the number of Sears stores in Puerto Rico has decreased from eleven to two, a reduction of eighty two percent. Likewise, since 2017, the number of Kmart stores in Puerto Rico has decreased from eighteen to only one, an even more dramatic decrease of ninety four percent. Furthermore, Transform KM and Transform SR have suffered losses in Puerto Rico for fiscal years 2019 and 2020, and year to date 2021. ECF No. 50, at 84-85; ECF No. 50, at 18.

At the evidentiary hearing, Transform presented evidence that it is meeting certain financial obligations. For example, the rent for both Sears locations in Plaza Las Américas is $112,000 a month and is currently up to date. The Sears store in Naranjito has a monthly rent of $25,000 that is also up to date. Meanwhile, the monthly rent for the Kmart store is $125,000 that is also current. Furthermore, Transform has never defaulted on tax payments. ECF No. 47, at 107-08.

The fact that Transform has not yet defaulted on its rent and tax obligations is not insignificant. However, the fact that Transform has suffered losses for the past three years raises pertinent questions regarding how it is sustaining these obligations. There are several plausible explanations. One possibility is that Transform is using its cash reserves to cover its losses. No evidence, however, was presented at the hearing regarding the size of such cash reserves, if any. This is compounded by the fact that Transform has not issued a single external audited financial statement since the Sears Bankruptcy in 2018.

Next, Transform could be meeting these obligations because it is the recipient of financial support from its parent company, Transform Midco. Evidence was presented at the hearing that Transform Midco pays all the vendors for Sears and Kmart stores from one central account and

that approximately four to six million dollars is being debited per business day from the central account, excluding payroll costs. ECF No. 50, at 66-69, 74. However, the mere fact that Transform Midco pays vendors four to six million dollars per day does not answer whether Transform Midco would ultimately pay a judgment levied against Transform SR and Transform KM. Another explanation may be that Transform is capable of paying rent and taxes despite its sustained losses because it is behind on other financial obligations, such as for example payroll expenses, which also would bode poorly for DLCA's execution of the judgment. Speculation into the realm of possibilities, however, is not necessary. Although Transform has presented evidence that it is meeting some financial obligations, the same is not necessarily indicative of Transform's ability to satisfy all its obligations (including potential judgments) in light of three consecutive years of losses, numerous store closures in a short period of time, and no evidence of audited financial statements to place Transform's assets, liabilities, equity, liquidity, and operations into context.

Transform also presented evidence that the Kmart store in Puerto Rico currently averages between $230,000 and $250,000 in sales per week while the Sears store in Plaza Las Américas averages $300,000 in sales per week. Nonetheless, these sales numbers are not indicative of the actual earnings of Transform. As stated earlier, Transform has suffered losses year to date 2021. Likewise, the mere fact that Transform derives revenue from licensed entities has no bearing on Transform's ability to satisfy a judgment because some entities pay the Transform corporate office directly. It is unknown whether said money is automatically transferred to Transform SR. Similarly, the fact that Transform SR's and Transform KM's volume of business in Puerto Rico for fiscal year 2018 was $69,000,000 and $28,000,000, respectively, is also not compelling. These volume of business numbers are from 2018 when the number of Sears and Kmart Stores

was significantly greater, and also do not show the actual earnings of Transform which would provide real insight into its financial condition.

At the hearing, Mr. Stoppen testified that disposal costs have not been requested for the Sears and Kmart stores in Puerto Rico and clarified that the disposal costs are usually requested from him about three to six months in advance of a store closing. ECF No. 50, at 72-73. However, the fact that disposal costs have not been requested for the Transform stores in Puerto Rico does not appease the concerns of whether DLCA would be able to execute a judgment in the future. Disposal costs could be requested for these stores tomorrow. According to Mr. Stoppen, the disposal costs could drive liabilities to exceed the assets of a store. ECF No. 50, at 78-80. Keeping in mind the realities of the ongoing COVID-19 pandemic, it is not certain that this litigation will be resolved in 2021. The fact that Transform discharged all of its marketing employees in Puerto Rico is also a sign that it is not dedicated to maintaining a robust presence on the island.

According to Mr. Stoppen, Transform SR had assets worth approximately seventeen million dollars as of May 1, 2021 and its liabilities are approximately seventy-five to eighty percent of its assets; half of said assets are classified as inventory that is not encumbered. As of May 1, 2021, Transform KM had between thirteen and fourteen million dollars in assets in Puerto Rico. Transform KM's liabilities are approximately equal to its assets in Puerto Rico. Therefore, no equity seems to be left over for Transform KM.

The main concern is that Transform SR and Transform KM have yet to issue a single external audited financial statement since the Sears Bankruptcy. Under these circumstances, Transform's ability to pay a judgment is uncertain. What is crystal clear, however, is overwhelming circumstantial evidence suggesting that Transform is an entity in dire financial

straits. The draconian reduction in the number of Sears and Kmart stores in Puerto Rico, three straight years of losses (despite Mr. Cruz's claim that the closings were part of a reorganization to increase efficiency), Mr. Stoppen's candid admission that the disposal costs of the remaining Sears and Kmart stores can drive the liabilities above the level of assets, and the complete elimination of the marketing department leads to a strong inference that Transform's presence in Puerto Rico is nearing its end and that concerns about its ability to satisfy a judgment are not unfounded.

### C. Circumstances and Interests

As previously discussed, DLCA has demonstrated a likelihood of success on the merits that it is entitled to the payment of Agency Fees from April 2020 to March 2021 in the amount of $699,999.96 for said months, the payment of $15,531.34 for unauthorized prompt payment discounts, and the payment of $9,559.31 for the format work invoices dated between February 28, 2020 to August 20, 2020. DLCA has also shown that there is reason to question Transform's financial viability. The court, however, must also consider the circumstances of the case and the interests of all the parties and adjudicate as substantial justice may require. See 32 L.P.R.A. App. V, R. 56.1.

Transform argues that "[a]fter letting eleven months' worth of alleged agency fee invoices accrue without engaging in even negligible collection efforts, [DLCA] now pretends to rely on an artificial sense of urgency to move this Court to attach Transform's property to secure the payment of invoices . . ." ECF No. 43, at 16. The record reflects that Ms. Vega emailed invoices for Agency Fees to Transform employees Mr. Booth and Ms. Díaz. Ex. 41 B; Pl Ex. 7; ECF No. 47, at 253-54; ECF No. 48, at 22-24. However, Ms. Díaz was furloughed by Transform on April 15, 2020 and ultimately terminated. ECF No. 49, at 22-25. Meanwhile, Mr. Booth only

worked for Transform until sometime in March or April, 2020. ECF No. 48, at 149-150. No evidence was presented at the hearing showing that Transform instructed DLCA how and where invoices should be delivered during the pandemic and following the furlough of the marketing department on April 15, 2020. On the other hand, there is also no indication that Ms. Vega contacted Ms. Peña, or any other Transform employee, to inquire whether Transform was receiving the Agency Fee invoices, aside from the email communications pertaining to the audit letter in February, 2021. Thus, it appears that Transform and DLCA were both neglectful of communicating with each other regarding the delivery of invoices during the pandemic. Nonetheless, DLCA's failure to receive any responses to Ms. Vega's emails regarding Agency Fees, or payments for Agency Fees after April 2020, should have raised red flags.

Although Mr. Cruz's first directive to Mr. Thompson in April 2020 to stop working was contradicted by his own subsequent communications in which he seemed to be fine with DLCA's assistance, by September 2020 it became evident that Transform did not want DLCA doing any more marketing work, even on matters like posting ads on Facebook. Ex. J-1; Ex. No. 47, at 51-52, 142. Moreover, Mr. Thompson's October 23, 2020 email to Mr. Cruz alluding to the "contract agreement, fees 2020 and contract renegotiation for 2021" went unanswered. Ex. 38; ECF No. 47, at 54.

DLCA's failure to receive payments for Agency Fees from April 2020 to October 2020, Mr. Cruz's unequivocal directive to stop work in September 2020, and the fact that Mr. Thompson's October 23, 2020 email was ignored were clear indicators that Transform had no intention of paying Agency Fees to DLCA during the pandemic. Yet, even when confronted with these warnings, DLCA chose not to terminate the Advertising Agreement. If DLCA was so concerned about the risk that it would not be paid, it could have protected itself by terminating

the Advertising Agreement in October 2020, if not earlier. DLCA cannot now request the

extraordinary remedy of prejudgment attachment to reduce the risk that it may not be paid

Agency Fees, particularly from November 2020 to March 2021 when it had a clear opportunity

to mitigate said risk by promptly terminating the Advertising Agreement.

DLCA's failure to terminate the Advertising Agreement after being confronted with a

plethora of signs that it may not be paid Agency Fees dooms its request that prejudgment

attachment be issued for the amounts of Agency Fees, at a minimum those owing from

November 2020 to March 2021. Therefore, it is recommended that prejudgment attachment be

issued in the amount of $408,333.31 for Agency Fees from April 2020 to October 2020, the

amount of $15,531.34 for unauthorized prompt payment discounts, and the amount of $9,559.31

for the format work invoices dated between February 28, 2020 to August 20, 2020 for a total of

$433,423.96. It is also recommended that DLCA's request that prejudgment attachment be

issued for the amounts of Agency Fees owing from November 2020 to March 2021 be DENIED.

## V.    Conclusion

For the foregoing reasons, it is hereby recommended that DLCA's request for

prejudgment attachment (ECF Nos. 9, 14) be GRANTED IN PART AND DENIED IN PART. It

is recommended that prejudgment attachment be issued in the amount of $433,423.96 for

Agency Fees from April 2020 to October 2020, unauthorized prompt payment discounts, and

format work invoices. It is also recommended that DLCA's request for prejudgment attachment

of the amounts owing on the Agency Fees from November 2020 to March 2021 be DENIED.

The parties have fourteen (14) days to file any objections to this report and recommendation

unless otherwise ordered by the court. Failure to file the same within the specified time waives

the right to object to this report and recommendation. Fed. R. Civ. P. 72(b)(2); Fed. R. Civ. P.

6(c)(1)(B); Local Rule 72(d); <u>see</u> <u>also</u> 28 U.S.C. § 636(b)(1); <u>Henley Drilling Co. v. McGee</u>, 36

F.3d 143, 150–51 (1st Cir. 1994); <u>United States v. Valencia</u>, 792 F.2d 4 (1st Cir. 1986).

     IT IS SO RECOMMENDED.

     In San Juan, Puerto Rico, this 14th day of June, 2021.

<u>s/Marcos E. López</u>
U.S. Magistrate Judge
